# EXHIBIT B

# BERWIND FINANCIAL, L.P. ◻

June 18, 2001

Mr. Fred P. Rullo
Chairman and Chief Executive Officer
Penn Specialty Chemicals, Inc.
Six Tower Bridge
181 Washington Street
Suite 450
Conshohocken, PA  19428

Dear Fred:

This agreement will serve as the contract between Penn Specialty Chemicals, Inc. (collectively
"Penn Specialty" or the "Company") and Berwind Financial, L.P. ("Berwind") regarding the
retention of Berwind as exclusive financial advisor to Penn Specialty, except for those purchasers
listed on Schedule A. ("Engagement Agreement"). Berwind's responsibilities involve providing
investment banking services to the Company, on an exclusive basis, focusing on private
placement alternatives involving raising debt and/or equity capital (the "Financing") in order to
replace the Company's existing senior lender. In addition, Berwind will explore the sale of all or
part of the Company (the "Sale"), or a financial restructuring of the Company's balance sheet by
the existing stakeholders ("Existing Stakeholders" as defined below).

## A.   Berwind's Role

   (1)   Berwind's Role as Exclusive Advisor in Selling the Company

   - Prepare an Offering Memorandum describing Penn Specialty, its historical
     performance and prospects, including existing contracts, marketing and
     sales, labor force, and management and anticipated financial results of the
     Company. This Offering Memorandum will not be given to any potential
     buyer without the prior consent of the Company and only after execution
     of a confidentiality agreement satisfactory to the Company, unless agreed
     upon by Berwind and Penn Specialty.

   - Work with Penn Specialty in developing a list of suitable potential buyers
     who will be contacted on a discreet and confidential basis after approval
     by the Company.

   - Coordinate the execution of confidentiality agreements for potential buyers
     wishing to review the Offering Memorandum.

Mr. Fred P. Rullo
June 18, 2001
Page 2

- Help Penn Specialty to coordinate site visits for interested buyers and work with the management team to develop appropriate presentations for such visits.

- Solicit competitive offers from potential buyers.

- Advise and assist Penn Specialty in structuring the transaction and negotiating of the transaction agreements.

- Upon execution of a letter of intent or similar documents, Berwind will assist in negotiating the transaction and assist Penn Specialty attorneys and accountants, as necessary, through closing on a best efforts basis.

(2) **Private Placement**

The role of Berwind, on a best efforts basis, as exclusive financial advisor regarding the financing or refinancing (the "Financing") of all or any portion of the Company's balance sheet, is to secure a lender(s) and/or investor(s) which will enable Penn Specialty to meet its financing objectives regarding structure, terms, conditions, flexibility, timing and a desirable lender/investor relationship. Once engaged, Berwind will provide the following services regarding the Financing:

- Advise, in light of current market conditions, on all aspects of the Financing, including timing, structure, and terms;

- Conduct due diligence and complete a formal Financing Memorandum which describes the Financing and the Company's business, including its history and future prospects;

- Approach potential lenders and investors, including commercial banks, commercial financing companies, private capital investment funds, and other institutional investors;

- Solicit term sheets from those lenders and investors interested in the Financing;

- Negotiate with lenders and investors regarding the terms and structure of the Financing;

- Advise Penn Specialty, its attorneys and accountants, as required, regarding documentation; and

- On a best efforts basis, participate in closing the Financing.

Mr. Fred P. Rullo
June 18, 2001
Page 3

(3)     **Financial Restructuring**

Berwind shall assist the Company in negotiating with various stakeholders in the Company (the "Existing Stakeholders"), including, but not limited to, PNC Business Credit, Bank of America, Fleet Capital Corporation, general unsecured creditors and other creditors and shareholders in regard to the possible restructuring of existing claims and equity.

(4)     **Opinion Services**

If requested in writing, provide an Opinion(s) to the Company's Board of Directors as to the fairness of the terms of the proposed sale of the Company or its various divisions and/or subsidiaries and/or non-debtor affiliates.

In performing the service described above, you agree to furnish or cause to be furnished to Berwind such information as Berwind reasonably believes appropriate to the execution of its engagement hereunder (all such information so furnished being the "Information"). The Company represents that all Information furnished by you or your agents will be complete and correct in all material respects, to the best of your knowledge, and that until the expiration of Berwind's engagement hereunder, you will advise Berwind immediately of the occurrence of any event or any other change known by you or your agents which results in the Information ceasing to be complete and correct in all material respects. The Company recognizes and confirms that Berwind (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated hereby without having independently verified any of the same and (b) does not assume responsibility for accurateness or completeness of the Information and such other information and (c) will not make an appraisal of any of the assets or liabilities of the Company.

B.     **Berwind's Fees - Advisory and Financing Fees**

Berwind's fees for acting as exclusive advisor in connection with the services outlined above will consist of:

(1)     An initial fee (the "Initial Fee") equal to $50,000, due upon signing this agreement; and

(2)     A monthly fee (the "Monthly Fee") of $25,000 per month payable on July 1, 2001, and payable on the first of each month thereafter and continuing throughout the Applicable Fee Period, as defined in section (3) below. The Monthly Fees will be credited back one hundred percent ("100%") against any Fees owed to Berwind in sections (3) through section (5) below; and

Mr. Fred P. Rullo
June 18, 2001
Page 4

(3)     If Penn Specialty completes or enters into a definitive agreement to complete the
        sale or transfer, directly or indirectly, of all or a significant portion of the assets or
        securities, of the business or any other extraordinary corporate transaction
        involving Penn Specialty, whether by way of recapitalization, consolidation,
        negotiated purchase, liquidation or otherwise, or any combination of the
        aforementioned during the Applicable Fee Period, as defined in section (4) below,
        to any party, or if a sale of all or substantially all or a portion of the assets or any
        combination thereof is consummated, Berwind shall be entitled to receive an
        Advisory Fee payable in cash, in federal funds via wire transfer or certified check,
        at, and as a condition of, closing of such transaction (the "Transaction Closing")
        equal to 1.25% of Total Consideration up to $60 million, and 2.50% of Total
        Consideration in excess of $60 million.

(4)     A financing fee (the "Financing Fee") with respect to any Financing which any
        entity or individual agrees to provide to the Company, and the Company in its sole
        discretion chooses to accept during the applicable fee period (either the Term,
        Renewal Period or Trailer Term, whichever applies, as defined, in the Term
        Section of the agreement below, the "Applicable Fee Period") will be payable by
        the Company to Berwind. The Financing Fee will be payable in cash, in federal
        funds via wire transfer or certified check, at, and as a condition of, closing of such
        Financing (the "Financing Closing"), regardless of whether the Company chooses
        to draw down the full amount of the committed Financing at that time, equal to:

        Senior Debt                 2.5% of proposed Financing;
        Subordinated Debt/Equity    7.5% of proposed Financing

        However, Berwind will not be entitled to a Financing Fee with respect to any
        overadvance or Debtor-in-Possession financing provided by PNC Business Credit,
        Fleet Capital and Bank of America ("Existing Lenders") and/or Mellon Ventures,
        Societe Generale or management ("Existing Shareholders")

        In the event any financing source obtained during the Applicable Fee Period for
        which Berwind is entitled to a Financing Fee increases the total amount made
        available to the Company within twelve months (12) months of a Financing
        Closing, Berwind shall be entitled to receive an additional Financing Fee based
        upon the above formulas as applied to the increased amount in section (4) above
        only.

(5)     In the event that the Existing Stakeholders agree to restructure their claims in a
        manner, which allows the Company to reorganize, Berwind will receive a
        restructuring fee (the "Restructuring Fee") equal to 2.00% of the value of the
        restructured Company (the "Restructured Valuation") payable to Berwind at, and

Mr. Fred P. Rullo
June 18, 2001
Page 5

(6)   In the event the Company requests an Opinion(s), Berwind will be entitled to an opinion fee (the "Opinion Fee") equal to $100,000 for the Opinion requested by the Company in writing, earned and payable at the delivery (the "Delivery Date") of the Opinion to the Board of Directors. The Opinion Fee will be credited back one hundred percent ("100%") against any fees owed Berwind, outlined in sections (3) through (5) above.

Berwind's Opinion Fee concerning the fairness of the proposed sale(s) is in no manner contingent upon conclusions in the Opinion or the closing of the sale. It is our understanding that Berwind's Opinion may be only one of a number of factors considered by the Company in reaching its decision regarding the sale.

(7)   However, in no event shall the Initial Fee, Monthly Fee, Advisory Fee, Financing Fee, Restructuring Fee and Opinion Fee outlined in sections (1) through (6) above, in aggregate, be less than $750,000.

(8)   Notwithstanding the foregoing, if the assets or securities of the Company are sold to the select group of potential purchasers contacted by J. P. Morgan as listed on Schedule A, attached hereto and made a part hereof, which Berwind and the Company shall agree upon and which select group shall be no more than ten (10) contacts, then Berwind's minimum fee shall be: (i) $250,000 provided that such a transaction is consummated outside of a Title 11 U.S.C. proceeding and provided that a definitive purchase agreement be executed no later than July 12, 2001; or (ii) $500,000 provided that such a transaction is consummated inside of a Title 11 U.S.C. proceeding and provided that J. P. Morgan is retained in such a proceeding as co-investment banker with Berwind; or (iii) $637,500 provided that such a transaction is consummated inside of a Title 11 U.S.C. proceeding and provided that J. P. Morgan is not retained in such a proceeding as a co-investment banker with Berwind.

(9)   In addition to the Initial Fee, Monthly Fee, the Advisory Fee, Financing Fee, Restructuring Fee, and Opinion Fee outlined above, the Company shall reimburse Berwind, on a monthly basis, for all reasonable out-of-pocket expenses, including legal expenses, incurred by Berwind in connection with its duties under this agreement for the duration of this representation.

C.   **Definitions**

For the purpose of this agreement:

**Senior Debt** means funds (i) received or to be received by the Company, or any entity acquired or controlled by, or under common control with the Company, in the form of
sale of accounts receivable facilities, or any o[...]

Mr. Fred P. Rullo
June 18, 2001
Page 6

Company or any entity acquired, or controlled, by or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, without any profit participation or yield enhancement as a return on the repayment of the funds received by the Company, or any entity acquired, or controlled by, or under common control with the Company, and (ii) for which the lender has a claim to the assets of the Company, or any entity acquired, or controlled by, or under common control with the Company, superior or prior to the claim of the holders of Subordinated Debt.

**Subordinated Debt** means (a) funds (i) received or to be received by the Company, or any entity acquired, or controlled by, or under common control with the Company, or for which the Company, or any entity acquired, or controlled by, or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefor at a fixed interest rate or a floating rate, and (ii) for which the lender does not have a senior claim to the assets of the Company, or any entity acquired, or controlled by, or under common control with the Company, on parity with or prior to the claim of the holders of Senior Debt, or (b) funds (i) received or to be received by the Company, or any entity acquired, or controlled by, or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, and (ii) for which part of the overall return to the investor on these funds is anticipated to consist of a participation in the profits of the Company and/or some other type of income enhancement (whether realized through equity warrants conversions of the debt to equity, or otherwise) which has the effect of raising the overall return on these funds to the investors above the level that could be realized solely due to the receipt of stated interest income.

**Equity** shall include, but not be limited to, common stock preferred stock, convertible stock, and the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plant and equipment or any other assets, or asset sale.

**Total Consideration** shall mean the purchase price paid for the stock or assets, or any portion of either, plus the assumption or payoff of indebtedness, which includes secured, administrative, priority and/or unsecured claims (trade or other) and the assumption of any other obligations on-balance sheet, off-balance sheet, contingent, non-contingent, liquidated and/or unliquidated as well as consideration payable under consulting agreements and/or non-competition agreements and for salaries and bonuses paid in excess of salaries and bonuses as of the time of the Transaction Closing as well as the assignment of leases, whether real property or personal, plus the value received or retained by the Company on either sold, retained or liquidated work in process, inventory, accounts receivable or any other tangible or intangible asset.

In the event that the consideration is paid in whole or in part in the form of securities of

fee, shall be the market value ther

Mr. Fred P. Rullo
June 18, 2001
Page 7

aggregate consideration may be increased by contingent payments such as an "earnout" or other monetary agreement in the transaction, the portion of Berwind's fee relating thereto shall be calculated and paid when and as such contingent payments or other monetary amounts are received.

Restructured Valuation shall mean the enterprise valuation of the restructuring of the Company's stock or assets, or any portion of either, plus the assumption or restructuring or payoff of indebtedness, which includes secured, administrative, priority and/or unsecured claims (trade or other) and the assumption of any other obligations.

D.     **Term of Engagement**

This agreement shall remain in force for a period of six (6) months from the date of signing this agreement. The Term will automatically renew for additional six (6) month periods (the "Renewal Periods"), unless either the Company or Berwind serve the other party written notice 30 days prior to the end of the Term. Expiration of the agreement shall not affect Berwind's right to indemnification under the Indemnification paragraph below or Berwind's right to a Financing Fee and/or Advisory Fee as calculated using the formulas set forth above for any Financing or Transaction completed by Penn Specialty for a period of twelve (12) months from the date of the end of the Term and any Renewal Periods (the "Trailer Term").

E.     **Indemnification**

The following provisions regarding indemnification, contribution and related matters have been agreed to by the Company and Berwind.

1.     Except as provided in the last sentence of this paragraph, the Company shall indemnify and hold harmless Berwind, and its partners, officers, agents, employees and affiliates (collectively, "indemnitees") from and against all losses, claims, judgments, liabilities, costs, damages and expenses, including reasonable attorneys' fees (collectively "Claims"), that Berwind may incur and which are based upon, or arise out of, any services that Berwind provides to the Company as its agent and financial advisor in connection with the services that Berwind provides, pursuant to this Engagement Agreement. The Company shall defend any Claim asserted against Berwind through counsel reasonably satisfactory to Berwind, which with Berwind's approval may be the Company's counsel. The Company shall pay Berwind's fees and expenses, including counsel fees, as they are incurred in defending any such Claim, and Berwind shall repay the Company for any costs and expenses advanced by the Company pursuant to the preceding sentence, in a case where it has been determined in a final judgment by a court of competent jurisdiction (not subject to further appeal) that the Claim resulted from

Mr. Fred P. Rullo
June 18, 2001
Page 8

2.  If for any reason the foregoing indemnity is unavailable to the indemnitees or insufficient to hold them harmless, the Company shall contribute to the amount paid or payable by the indemnitees as a result of the Claim in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and the indemnitees on the other, but also the relative fault of the Company and the indemnitees, as well as any relevant equitable considerations. In no event shall the aggregate contribution of the indemnitees to all Claims exceed the amount of fees actually received by the indemnitees pursuant to the engagement letter. The parties further agree that the relative benefits to the Company on the one hand and the indemnitees on the other with respect to any Financing contemplated by the engagement letter shall be deemed in the same proportion as (i) the total value the Financing bears to (ii) the fees paid to Berwind with respect to the Financing.

3.  Berwind shall not have any liability to the Company or any other person in connection with the services performed by Berwind pursuant to the engagement letter (whether direct or indirect, in contract or tort or otherwise) except for any liability for losses, claims, damages or liabilities that is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from the gross negligence or willful misconduct of Berwind.

4.  The Company shall not settle or compromise, or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought from the Company by Berwind or any bother of the indemnitees (whether Berwind is any actual or potential party to the claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of Berwind and all other indemnities from all liability arising out of the claim, action, suit or proceeding.

5.  The provisions hereof shall survive any termination or completion of the engagement set forth in the engagement letter.

### *Confidentiality*

Berwind agrees to maintain the confidentiality of all information provided to it by the Company regarding the Company or a Transaction, and shall not disclose any such information to any person other than employees of Berwind without the prior consent of the Company. The obligations regarding confidential information received hereunder shall not apply to any such information which: 1) is or becomes part of the public domain or is or becomes publicly available without breach hereof by Berwind; or 2) is lawfully acquired by Berwind from a source not under any obligation to the Company regarding disclosure of such information and its release is expressly authorized by such source; or 3) is disclosed to any third party by or with the permission of the Company without confidentiality restrictions; or 4) is developed by or on behalf of Berwind by individuals who have not received confidential information hereunder

Mr. Fred P. Rullo
June 18, 2001
Page 9

### *Assignability of this Agreement by Berwind.*

The Company acknowledges that the individuals at Berwind with whom the Company has dealt and will be dealing with are among the principals of Berwind's Special Situations practice. Berwind and the principals of its Special Situations practice have entered into a preliminary agreement pursuant to which the principals will purchase the Special Situations practice from Berwind in a management buy-out transaction. The purchase is subject to regulatory approval and other conditions, but may be completed prior to the conclusion of this engagement. Client acknowledges and agrees that Berwind will assign all its rights and duties under this Engagement Agreement to the entity which acquires the Special Situations practice, and that upon such assignment Berwind shall have no further rights or obligations hereunder.

### *Bankruptcy Proceeding*

In the event the Company files a Chapter 11 Bankruptcy proceeding during the Applicable Fee Period, the Company shall employ Berwind upon the same or substantially similar terms and shall have this Engagement Agreement and Berwind's retention as the Company's exclusive financial advisor approved by a Court of competent jurisdiction.

In the event that the Company files a Chapter 7 Bankruptcy proceeding or if a Chapter 11 proceeding is converted to a Chapter 7 proceeding, any Trustee so appointed shall not be bound by the terms of this agreement, but Berwind reserves its rights hereunder to assert that any post petition services provided by Berwind to the Company substantially benefited the bankruptcy estate.

The Company agrees that Berwind has the right, following the closing of a Transaction, to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder. No public disclosures or press releases in connection with a Transaction are to be made mentioning Berwind without Berwind's prior consent.

Any amendment, modification or other changes to this Agreement must be in writing and signed by both parties to be enforceable.

Mr. Fred P. Rullo
June 18, 2001
Page 10


Please indicate your acceptance of the foregoing by executing and returning the enclosed copy of this letter.

**BERWIND FINANCIAL, L.P.**
By:   Berwind Securities Corporation,
      General Partner


By:   _____         _____
      Mark E. Chesen                       Matthew P. Karlson
      Managing Director          Vice President


ACCEPTED:

**PENN SPECIALTY CHEMICALS, INC.**

By: _____            06/20/01
    Mr. Fred P. Rullo                      _____
    Chairman and Chief Executive Officer   Date